UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
PLAINTIFF, ) CASE NO. 2:23-cr-188
)
vs. )
)
STEPHEN CHINN, )
)
DEFENDANT. )
)

TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE SARAH D. MORRISON, CHIEF JUDGE
MONDAY, JUNE 16, 2025; 1:00 P.M.
COLUMBUS, OHIO

FOR THE PLAINTIFF:
Dominick S. Gerace II
United States Attorney
By: Emily Czerniejewski
Assistant United States Attorney
303 Marconi Boulevard, 2nd Floor
Columbus, Ohio 43215

FOR THE DEFENDANT:
Douglas A. Funkhouser Co. LPA
By: Douglas A. Funkhouser, Esq.
765 South High Street
Columbus, Ohio 43206

Larry W. Thomas, Esq.
98 Hamilton Park
Columbus, Ohio 43203

\- - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

Monday Afternoon Session

June 16, 2025

\- - -

(The following proceeding was held in open court.)

DEPUTY CLERK: Case number 2:23-cr-188, the United States of America versus Stephen Chinn.

THE COURT: Thank you. If counsel will please enter their appearances, starting with counsel for the government.

MS. CZERNIEJEWSKI: Good afternoon, Your Honor.

Emily Czerniejewski on behalf of the United States.

THE COURT: Thank you.

MR. THOMAS: Good afternoon, Your Honor.

If it please the Court, Larry Thomas, Doug Funkhouser on behalf of Stephen Chinn, Your Honor.

To my right is Stephen Chinn.

THE COURT: Good afternoon. Good afternoon, Mr. Chinn.

THE DEFENDANT: Good afternoon, Your Honor.

THE COURT: Ms. Czerniejewski, what's the status of this case?

MS. CZERNIEJEWSKI: Your Honor, on August 27th, 2024, the defendant entered a plea of guilty to Counts 2 and 3 of the indictment pending against him that charged him with receipt and possession of child pornography, respectively, in violation of federal law.

It was entered pursuant to a Rule 11(c)(1)(C) plea agreement, and we are here today for sentencing on the matter.

THE COURT: All right. Thank you.

Mr. Chinn, if you would please stand.

Did you receive a copy of a document called a Presentence Investigation Report?

THE DEFENDANT: I have, Your Honor.

THE COURT: And did you have an opportunity to review the information contained in that report?

THE DEFENDANT: I did, Your Honor.

THE COURT: Did you also have an opportunity to talk to your lawyers about the report?

THE DEFENDANT: Yes, Judge.

THE COURT: All right. Great.

And, Mr. Thomas, no unresolved objections, is that right?

MR. THOMAS: That is correct, Your Honor.

THE COURT: All right.

Then I do adopt the Statement of Facts and conclusions reached in the Presentence Investigation Report as my own.

It does result in an Offense Level of 30, with a Criminal History Category of I. That does result in a Sentencing Guideline Range of 97 to 121 months of incarceration.

Count 2, for the record, does have a mandatory

minimum of five years, with a maximum of 20 years; and Count 2 -- excuse me -- Count 3 has a maximum of ten years.

Of course, there is a binding plea agreement here, and the agreed-upon sentence between the parties is a sentence of between 60 months and 108 months.

So with that, I did read both sentencing memos as well as the letters that you submitted, Mr. Thomas.

I am now happy to listen to any additional arguments, and I will start with you, Mr. Chinn.

You are not required to say anything as part of the sentencing hearing. But if there's anything you want to tell me before I sentence you, now is your chance to do that.

THE DEFENDANT: Yes, Your Honor.

Thank you, Your Honor.

First and foremost, I must apologize to the victims in this case. I never intended to hurt anyone.

But after 21 months of sober reflection, I realize my actions are paramount.

During the debauchery, I became part of a process that furthered the psychological torment in the lives of those girls.

I cannot imagine how they suffered. Not only were they victims of the initial heinous acts, but then they were re-victimized when I downloaded images of possibly the most painful moments of their lives.

By doing so, I contributed to and prolonged their agony. How could I have been so blind to their pain?

I feel helpless that I cannot alleviate their misery.

I cannot express my contrition to them directly; however, Your Honor, I want to convey to you how sorry I am for adding to their anguish.

I also apologize to my friends and family, many of whom -- many of whom are here today.

It pains me to have brought shame and disgrace upon them.

Dad, I'm sorry I let you down. All I ever wanted to do was make you proud.

I pray that I may have more time with you together so that this -- this is not the last image you will have of me.

Mom, my remorse knows no end. Please know my actions are in no way a reflection on you.

My failings are mine and mine alone. You and dad did a wonderful job raising me.

I love you both, as well as my brothers and my friends, more than I can ever express.

Your Honor, what I did, I did in the throes of addiction. This in no way excuses my behavior. I only wish to provide context.

Adderall, in ever higher quantities, had consumed me and altered my brain chemistry. A profound loneliness

enveloped me.

After several attempts of forging meaningful emotional relationships, connections -- connections, intimacy issues ultimately caused me to stop trying. I endeavored to remedy these obstacles.

For two years, I attended weekly psychological therapist sessions to address my debilitating erectile dysfunction, but to no avail.

Fear of rejection and my performance anxiety, coupled with my shy introverted nature, hindered me from pursuing a romantic relationship.

Rather than cultivating a healthy response to this loneliness, I took refuge in drugs and pornography to fill the void inside of me.

In this unhealthy state, even without the use of dark web, I came across a vile corner of the internet and quickly spiraled down to depths I did not theretofore believe possible.

Your Honor, I strongly believe, as Robert Pirsig wrote in *Zen and the Art of Motorcycle Maintenance,* that we as human beings are moving towards quality or away from quality.

My substance abuse, isolation, and illicit sexual behavior are evidence of my pre-backtrack away from quality, Your Honor.

I know the officers in this case did the right thing. They provided the shock I needed to honestly examine and begin to address my deteriorating situation.

While sitting handcuffed in the back of that police car, my initial terror and panic were replaced by a cathartic sense of relief. I did not like the person I might have become.

I was relieved to be away from the drugs. I was relieved to be away from the sordid temptation of looking at images on the internet. I was relieved of a depraved secret. A core part of me realized how sick I might have become and welcomed external intervention.

I did not always live in this space.

Except for this case, I have been an upright, law-abiding citizen with no criminal record.

In fact, throughout my life, I've contributed to community good -- community service and societal good.

At school, I was on the varsity soccer, basketball, and tennis teams, in addition to performing with the drama club.

In college, I demonstrated my compassion for elderly people suffering from Alzheimer's disease by volunteering at a nursing home, a pursuit near and dear to my heart as my father is now afflicted with that horrible condition.

I graduated with honors from law school. Instead of

pursuing money and power, I devoted my entire professional life to advocating for the poor, disenfranchised, and marginalized people.

Most importantly, as evidenced by my character references, and my friends, family, and coworkers here to support me, I've cultivated strong loving relationships with people from every chapter of my life.

I have been awestruck by their stalwart support during -- despite the knowledge of my crime. I am forever humbled and grateful to them.

Your Honor, besides friends and family, I have lost everything. I have lost my reputation, my job, my career, and my livelihood.

In addition to restitution to be ordered by this Court, I still owe roughly $200,000 in student loan debt. This debt was set to be forgiven by my years of public service but now looms over my financial future, with no clear path to repayment.

With a daunting label of "sex offender," I will forever be viewed as a pariah. I will be unfairly lumped together in the public eye with nefarious producers and distributors of child pornography and the villanous predators who physically perpetrated sexual abuse of children.

I will be denied the authorization and opportunity to live in certain neighborhoods or travel where I wish. I

will never escape being ridiculed or ostracized.

I will be placed under strict governmental supervision for a significant period of my life.

Two years ago, I lost my freedom. Today, the Court will determine how much longer I will stay behind bars.

I respectfully request the Court to take into consideration everything my attorneys and I have said today.

I believe these severe consequences, along with five years of incarceration, is sufficient punishment for my actions and time enough for my rehabilitation.

The government is asking you to hold me to a higher standard, to make an example of me on account of my law degree and my service as a public defender.

I simply ask the Court to judge me fairly and to uphold the sacred legal standard that justice is blind.

Your Honor, I am not the wretch the government portrays me to be.

I did not have any, nor considered to have any, physical contact or verbal communication with any victim. I did not produce images, nor did I request images to be produced.

I neither bought, sold, traded, nor exchanged images with anyone. I neither engaged in, nor desired to engage in, a conversation with anyone about such activities.

The truth is, way before I was subject to an

investigation, I deleted all the images from my computer due to an immediate overwhelming sense of shame.

When the drugs wore off, when the binge was over, when I sat with the knowledge of what I had done and contemplated where my perverse curiosity had led me, I hated myself.

I tried to flee from the memory of those disturbing images by purging them from my computer, rendering them completely inaccessible to me. I wanted to flee from myself, but I was stuck looking at my tainted reflection.

I wish I could go back in time and prevented myself from committing these immoral actions.

I wish I could pull myself away from that degenerate stupor and never had visited that website.

I wish I could spare those girls from all of their pain, but I can't. I will always live with the fact that my actions perpetuated mental suffering upon others.

A scarlet letter is indelibly imprinted on my soul. As a result, I pray for redemption, and I will pledge my life to transformation.

Your Honor, today, I will accept the Court's judgment, knowing my life will be forever changed.

I had found that my calling as a public defender was the honor of my life to help people navigate the legal system. I loved my job. What will I do now that I have

destroyed my own dreams of serving the poor of Franklin County as defense counsel?

I have already begun my rehabilitation in my current surroundings. During my incarceration, without officially offering legal advice, I have taken frightened, unsophisticated, first-time offenders under my wing to explain and educate them about the legal process.

I have worked diligently to develop healthy outlets and mindsets. I routinely exercise. I meditate, read, and write.

I have composed a Tolkienesque novel entitled *Austin Chronicles.* While not as spellbinding as *Lord of the Rings,* it has given me an opportunity to focus on positive activities.

I will continue on this path at the B.O.P. I will engage fully with all recommended counseling and programs.

I will continue to hone the art of writing, with the hopes of becoming a successful author.

Your Honor, I will continue using my time to move back to quality and contributing to goodness in this world.

Thank you, Judge.

THE COURT: All right. Thank you, Mr. Chinn.

Mr. Thomas, do you want to add anything from your sentencing memo?

MR. THOMAS: Your Honor, thank you very much.

And, Your Honor, at the proper time, I would like his mom to read a statement to the Court if that would be permissible.

THE COURT: Okay. Do you want her to go before you make your statement?

MR. THOMAS: Would that be okay, Your Honor?

THE COURT: Sure. Absolutely.

Ms. Chinn, if you would step forward and come to the podium.

MS. CHINN: I'm Tara Lynn Chinn.

THE COURT: Okay.

MR. THOMAS: Come on up.

THE COURT: If you will step there, just so we can all hear you, and if you will talk slowly so the court reporter can get it.

You said your name is Tara Lynn Chinn?

MS. CHINN: Isn't that terrible? My mom couldn't believe that was going to be my name. It used to be Tara Lynn Albery, but Tara Lynn Chinn has a certain ring to it, doesn't it?

THE COURT: Yes, it does.

MS. CHINN: Thank you, Your Honor, for hearing me speak for the Chinn family. This includes Stephen's brothers, uncles, aunts, and cousins.

Stephen Michael Chinn. Stephen, named after the

first Christian martyr. Michael is an archangel and the middle name of my husband.

He is the fourth son. We have -- all of our sons are gifted and unique.

Steve, as a child, was quiet and thoughtful. He tried to get his brother Will to talk for him. He is still a quiet and thoughtful man.

He is quite intelligent and has shown a resilience that is impressive, given he has been detained in protective custody 20 hours a day in a cell. I cannot say I would make it a week under these circumstances.

Steve is a likeable, humble man, who was an athlete in high school. He played tennis, was in a swim team, soccer, and basketball. He was number one rebound in Columbus his junior year for his high school. And in his senior year, he led the team as a forward to the league championship.

At college, Steve studied philosophy and English. He is an excellent cook and worked in the restaurant business in college and law school at Capital.

He graduated cum laude. He didn't tell us until I read it at the law school graduation ceremony. He placed in the top 10 percent on the Ohio bar exam.

His consideration and empathy for others show in how he handles his clients' cases.

One of his first clients was an elderly woman who was arrested for theft in Walmart. Steve talked to her and thought she might have dementia. He had her medically evaluated, and, yes, she was found to have dementia.

Another client had a difficulty in the suburb about her lawn. Steve drove out to his client's house and talked to her and found that she was having a difficult time getting a reliable lawn service. So Steve helped her with that.

Steve is not desiring wealth or riches. He does not call attention to himself.

While living in Section 8 housing in the Short North, a few panhandlers situated themselves around his place on High Street. His brother Will was always asked for money.

When Steve was walking home, a man asked him for money, looked at his shoes, and said, "Man, you need this more than me."

Steve is not a violent man. He is a pacifist and would protest against the Afghanistan war. He has never hit or punched anyone. He is gentle and kind.

Our family loves Stephen, and we will do everything possible to support him now and in the future. Since his dad and I are elderly, we will do everything to support him. His aunts, his brothers, his cousins, and uncles are standing behind him. His friends are standing behind him.

Andrew Cosslett told me he will be at the gate when Steve is released. Eric Sturman, Ian Thickstun, Michael Burk, all childhood friends, are still with him, as is new friends from his early adult years. They all text me and talk to Steve on a regular basis.

We are a community of people who will provide support, encouragement, and love to Steve.

Love -- patient, consistent, hoping always, believing, encouraging, not turning away from difficulty. Love holds firm. The Chinn family holds firm. We love Steve, and we are holding fast until he is home with us, or until we all die.

This is our commitment to the Court, Your Honor. We will never desert Steve.

THE COURT: Great. Thank you very much, and thank you for your comments.

Mr. Thomas?

MR. THOMAS: Thank you, Your Honor.

Judge, I would just like to say I don't think that I could say anything any better than what Steve has said and what his mom has said.

I know the Court is looking at several factors in determining a sentence that is fair for Steve, the nature and circumstances of the offense, and the history and characteristics of the defendant.

I would agree with the government: Nothing is

disputed in terms of the facts of this case and over the time period that these things happened. There's no trying to minimize that.

I don't think the government would in any way dispute the fact that his history and characteristics are, directly quoted: He has never been in trouble, always been a model citizen, worked as a civil servant his whole career.

What he didn't mention was that he did -- when he talked about destroying his dreams, Steve had a desire to work his way up the chain and some day run for Muni Court of Franklin County, Ohio.

He had thought at that particular point that his judgment was ideal in his demeanor for being a judge. He even sounds like a judge sometimes.

Judge, when he says he wrote a book and a novel, he's not telling the Court something that -- if I may, when they come in -- if I may.

THE COURT: Absolutely.

MR. THOMAS: Judge, would you like to see it?

THE COURT: I can see from here that there's a lot -- it looks like it's even front and back and hand-printed. Wow. That's --

MR. THOMAS: Yes.

THE COURT: -- a lot of time.

MR. THOMAS: As you can tell, he -- he has used

his time to try to develop his mind.

I don't disagree with his mom, Judge. I don't know what I would have been able to do, at 41 years old, never been in jail, never been handcuffed, and all of a sudden, I am snatched off the street, and I am not saying I wasn't deserving of it, but to be tossed in that type of environment, what it would do to me psychologically at that time and how hard it would be to adjust to somebody who is probably surrounded by people who has been in the system for years, but Stephen has turned this into a positive.

Instead of causing trouble, he has tried to assist. Instead of sitting there, he has tried to make the best of the situation, reassuring his mother and father that he's going to try to do his best.

Judge, 3553 factors invite the Court to look at the person that stands before them. Thank God. Because Stephen's normal guideline would have been an 18. They add on the relevant conduct. I'm not going to disagree and go back and forth with that. They add all these points. So he ends up a 30, but a 30 doesn't reflect the man that is in front of this Court.

The only way that the Court is going to ever know is when Steve gets out and he tries to maneuver through if, in fact, he has learned, and I think -- Judge, I am asking this Court for an opportunity for that to take place sooner than

later.

I am asking the Court for the minimum sentence in this case because I think Steve deserves that opportunity, Your Honor, based on his past and what he's been doing since, and the amount of time that we are talking about the circumstances of this offense.

He wants to -- Judge, one of the things that I find that -- he was licensed to practice law. That was his heart and soul. That's what he worked hard for, Judge.

I don't have to tell you or any lawyer in here what that consists of, and I don't have to tell you what kind of pressure and stress that we are under.

I am not saying it's out of the world or unusual, but we have a lot of different elements in our profession, and that's why we have to do the CLE, to tell us how to avoid it, but my point -- point being, he got caught up, and that's probably the worst of the worst for Steve. It is not the best of him, because the best of him is all the other positive things he has done.

But I say that to say: He can't go back. Your Honor, I was a cement finisher. But if I was caught and charged with this, the minute I get out, I can go back and get work back in the cement field. Steve has lost his dream. He has got to work hard to just to be able to cope with what he has to do.

I can't imagine how painful -- when you start talking about punishment, how painful -- and he's not blaming anybody, Judge. He takes full responsibility, and that's what a sentence in prison is for. It is to change a person, to let them see the nature of their offense, and to fix it. It's not to "oh, let's just keep him in there."

He's being punished, clearly, and now starts the process of reconstruction. He can sit in there for five more years or whatever. For what? What does that do when he's learned -- clearly -- what his actions brought about? Now he needs to try to recover.

Judge, I am asking for a chance for him to be on supervised release as soon as possible.

In this case, I would ask the Court for a sentence of 60 months, which was agreed upon as a minimum, and let him get on to trying -- Judge, I'm also asking if the Court would consider having Steve complete a drug program, also a sex program.

Judge, I would ask the Court if the Court could recommend he be sent to Elkton here in Ohio. That's the closest. I think that would be easier for everybody concerned in this case if he was somewhere local. And, Judge, just credit for the time that he's already served.

Thank you very much, Your Honor.

THE COURT: Thank you. I was just double-checking.

Elkton is one that does have the right programming for him, so great.

Thank you, Mr. Thomas. I appreciate it.

MR. THOMAS: Thank you, Your Honor.

THE COURT: You all may be seated.

Ms. Czerniejewski, do you want to add anything from your sentencing memo?

MS. CZERNIEJEWSKI: Yes, Your Honor. I just want to address just a couple comments that came up today in court.

As a lawyer, sitting across from, really, three lawyers, one that's disbarred, it's never my job to make job to make an example of somebody. That's not why I do this job. In fact, my job is to protect the most vulnerable individuals in society, and Mr. Chinn is one of the individuals who preyed on them.

He is here because of his decisions. Not mine. And I want to make that clear going forward.

When we talk about why Mr. Chinn is being prosecuted, we can't ignore the fact that at the time he was engaged in these offenses he was in a position of trust and authority.

I think it's really important to note that he talks about his career as a Franklin County Public Defender being his dream job, and the website indicates that the mission of the Franklin County Public Defender's Office, quote, provides comprehensive legal representation services in

criminal, juvenile, and custody proceedings to indigent persons in Franklin County so as to fulfill the constitutional mandate of equal justice under the law -- the same law that Mr. Chinn was breaking.

I can't think of anything more egregious than an individual going in, representing the life and liberty of somebody, and then going home and violating those same laws he is seeking to try to uphold through representation of individuals who need him and, really, in the worst possible way.

When we talk about a sentence in this case, 60 years [sic] is the mandatory minimum. This is not a mandatory minimum case, Your Honor.

He did not complete these crimes in the least exacerbated way, and we know that because this isn't as if he was online on the clear web searching for images of maybe age-questionable females -- which is not okay, I'm not condoning that -- because he's having some internal issues with intimacy.

He is on Russian dark websites, and the sexual abuse material in this case only depicted babies, toddlers, and prepubescent minors -- quite literally, the worst of the worst child pornography. And the images that those babies, toddlers, and prepubescent minors were depicted in, that content was bestiality, bondage, sadistic and masochistic

abuse. This is literally the worst child pornography on the internet, and he sought it out.

This case came to light after the National Center of Missing and Exploited Children flagged his account, and members of the ICAC, who are here today, began the investigation into him.

In fact, how he began looking for this is he took images of child porn that he liked, as I just described, and dragged and dropped it into Bing Image. Kind of like if you like a pair of shoes and you want to find similar shoes to what you are interested in, you drag an image, and Bing will tell you where to go. That's what he did, but for child pornography.

I am in no way, and the government, the United States of America, is in no way trying to make an example of Mr. Chinn. But what's most concerning to the government is the fact that the support that is here today -- and let me be clear, I am happy that all of the individuals on the right side and left side -- if they are seated there in the courtroom -- are here on his behalf.

What's concerning is all of that support existed at the time these behaviors occurred.

This is not the normal child exploitation case Your Honor sees. Usually we see a history of abuse, sexual abuse, physical abuse, violence, unstable relationships, unstable

housing, and none of that exists here.

Mr. Chinn had every opportunity to exceed. And, instead, he chose this path. Again, we're here because of his decisions, not mine.

I also want to note that there has been some reflection by him as it relates to -- as to the reasons he did this, his addiction. And I would note that addiction is obviously one of the most prevalent things in the United States, but addiction doesn't make you turn to child pornography. Drugs and alcohol don't make you turn to child pornography. People use drugs and alcohol and don't get on the dark web to look for this content.

So I have concerns that he is not insightful about the reasons for why he has turned to this and, instead, is looking into alternative ways to kind of place blame or justify the decisions that he has made.

Finally, I want to note that the sentencing range agreed to by the parties in this case was between 60 and 108 months, and the government is asking for 108 months.

And this is fair. It lays directly in the middle of the guidelines as calculated by the Sentencing Commission based on the crimes that he's committed.

A 108-month sentence is commensurate with the sentences that this Court has handed out on similarly situated defendants, minus the fact that this one is in a

position of trust and authority. It's fair according to the guidelines. It encompasses the mandatory minimum but also the egregiousness of the behavior.

He committed these crimes in a very calculated and careful manner. He downloaded, viewed, and deleted so as to cover his tracks, and had he been a little more careful, he would probably be in court representing individuals on behalf of Franklin County.

But based on the detective work and the police work of the Internet Crimes Against Children, who had to review over 4,000 images of the material that I just described, he's here, and his decisions have led him to ask -- for the government to ask for a 108-month sentence, which is exactly what the guidelines contemplate. It's exactly what the agreed range between the parties contemplates, and what the facts of this -- facts of this case warrant. And because of that, we are seeking a term of 108 months incarceration.

THE COURT: Thank you. Where are we on the restitution?

MS. CZERNIEJEWSKI: Your Honor, the parties have not been able to reach an agreed restitution order in this case.

I believe the restitution hearing has to be held within 90 days. If it's actually going to a full restitution hearing, there's thousands of documents that the government

would have to submit to the Court for review, so we had talked about maybe setting a 60-day status date or briefing date between the parties and then a 90-day restitution date. But as of today, we are not able to agree on restitution, so we would be asking to hold the AVAA and JVTA assessments in abeyance in lieu of deciding whether or not restitution will be ordered in this case.

THE COURT: Do you -- I assume that what you are talking about for restitution, though, are just identifying some of the series that have already been --

MS. CZERNIEJEWSKI: So, Your Honor, I've actually --

THE COURT: Like the letters that you submitted with your sentencing memo?

MS. CZERNIEJEWSKI: Yes, Your Honor, and I've actually done all of that.

There was an agreed restitution order prepared and given to the -- to counsel for the defense approximately five months ago. There are 16 identified victims who sought restitution.

As part of my practice, I go and review all the child pornography that depicts the victims that are seeking restitution to make sure it's -- it depicts the federal definition of child exploitation material.

I summarize all the restitution materials, what I've reviewed, and I put it in a chart, and that has been given

over to the attorneys as well, along with our agreed order.

Obviously, it's not agreed at this point, but all of that is done on our end. We are ready to either enter the agreed order or seek the full amounts.

THE COURT: Okay. I assume 60 days works for you, Mr. Thomas?

MR. THOMAS: Yes, it does, Your Honor.

THE COURT: I'll do that.

MS. CZERNIEJEWSKI: Thank you, Your Honor.

THE COURT: All right. Great.

Anything additional from Probation?

THE PROBATION OFFICER: Nothing, Your Honor.

THE COURT: All right. Thank you.

Mr. Chinn, if you would stand again, please.

So Mr. Chinn is before me for sentencing after pleading guilty to one count of receipt of child pornography and one count of possession of child pornography.

After the Supreme Court decision in *United States v. Booker,* I do have to undertake a three-part analysis before I impose the final sentence.

The first task is to compute the sentencing guidelines, and that has been done without objection.

I am next required to consider the guidelines themselves to see if there are any appropriate departure bases either up or down, and I do find there are no grounds

to depart in this case.

Then the last part of the sentence requires me to look at a series of factors contained in federal law to make sure that any sentence imposed is sufficiently severe to accomplish all of the goals of sentencing, but no more severe than necessary to accomplish those goals.

That last step begins with me looking at the nature and circumstances of the offense, together with the criminal history and personal history and characteristics of the defendant.

In this case, authorities received a tip from the National Center for Missing and Exploited Children about child sex abuse material that was uploaded to a search engine.

The investigation led to Mr. Chinn.

A search of his desktop computer found 4,286 images and nine videos of child sexual abuse involving infants, toddlers, and prepubescent minors.

The search also revealed that Mr. Chinn frequented a Russian website that people use for exchanging child sexual abuse materials.

He has accepted responsibility for his offense.

With that said, I do have some concerns with what I felt were -- what I believe and sounded to me like efforts to minimize his conduct given the number of images that were found on the desktop.

Given some of the things that Ms. Czerniejewski pointed out, the nature of the material, the dark web, and his efforts to find additional images, the conduct is quite serious.

Also, Mr. Chinn is certainly not the typical defendant that I see. He was a state public defender at the time of his arrest.

He was born and raised in Ohio. His parents were both medical professionals. He grew up in a nice home and was well provided for. He went to a private school and played tennis, swimming, soccer, and video games. He was in the drama club and got good grades.

We heard from his mother today, who is loving and very protective of him. He has two older half siblings and I think said that they are here today.

After high school graduation, he went to Antioch College for two years before graduating from Ohio State.

He worked at his high school alma mater as a teacher and coach for several years.

After he had been at the school for a short time, he was required to submit to a random drug test, but he had been smoking marijuana since he was around 15. So, at that point, he did go to substance abuse treatment.

A couple of years later, he decided to go to law school. He quit law school for a time but did ultimately

reenroll, graduating in 2016. While in law school, he continued to use marijuana and started using Adderall and was drinking beer every day.

He has experimented with cocaine, prescription pills, including the Adderall and Vicodin, mushrooms, and LSD, and he talked today about some of his -- he did grow addicted to Adderall.

You know, I struggle with this case. I did read all of the letters, and I do think you know from representing your clients, Mr. Chinn, I mean, none of us are as bad as our worst deeds, nor are we as great as our good deeds, and I do think there is certainly opportunity for rehabilitation.

By the time you are getting out, you will be in your mid-40s, and I do accept the representation that you are doing what you can to make the best of the situation, and you will continue to improve yourself.

As part of sentencing, I also look for a sentence that promotes deterrence to people who might be inclined to commit this kind of offense, look to the seriousness of the crime involved, protect the public, and also promote respect for the law; and, finally, I must avoid unwarranted sentencing disparities among defendants with similar records and guilty of similar conduct.

When I take all of this into consideration, I do accept the plea agreement.

Pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. section 3553(a), it is the judgment of the Court that the defendant, Stephen Chinn, is hereby sentenced to a term of 96 months of incarceration on Counts 2 and 3, to run concurrently with each other -- that is eight years -- to be followed by a 20-year term of supervised release on Counts 2 and 3, to run concurrently with each other.

While in custody, I do recommend that Mr. Chinn participate in sex offender treatment, substance abuse treatment, and mental health treatment.

I also will recommend that he serve his sentence at Elkton.

Within 72 hours of release from imprisonment, Mr. Chinn must report to the Probation Office in the district to which he is released.

While on probation, he must commit -- must not commit another federal, state, or local crime. He is prohibited from possessing a firearm, ammunition, destructive device, or dangerous weapon.

He must not unlawfully possess a controlled substance and must refrain from any unlawful use of a controlled substance.

He must submit to one drug test within 15 days of release from imprisonment and at least two periodic tests thereafter as determined by the Court.

He must cooperate in the collection of DNA as directed by the probation officer and must comply with the requirements of the Sex Offender Registration Notification Act as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he resides, works, is a student, or was convicted of a qualifying offense.

He must comply with the standard conditions of supervised release adopted by this Court as well as the following special conditions:

Number one, he shall participate in a program of testing, treatment, and/or medication compliance for alcohol and controlled substance abuse as directed by the probation office until he is released from that program.

There will be a copayment of no more than $25 per month for those treatment services, the exact amount determined by his ability to pay.

Number two, Mr. Chinn shall not possess or view material, images, videos or computer files containing sexually explicit conduct as defined by 18 U.S.C. Section 2256(2)(A) and (B).

Number three, Mr. Chinn shall participate in a program of mental health assessment and/or counseling as directed by the probation office until his release from that program.

There is a copayment of no more than $25 per month

for those services as well, the amount determined by his ability to pay.

Number four, Mr. Chinn shall participate in a sexual offender treatment program, to include a sex offender risk assessment, psychosexual evaluation, and/or other evaluations as needed. He shall follow the rules and regulations of the sex offender treatment program as approved by the probation office.

He shall sign all necessary authorization forms to release confidential information so that treatment providers, the probation officer, polygraph examiners, and others, as necessary, are allowed to communicate openly about his course of treatment and progress in treatment.

He shall make a copayment for sex offender treatment services of no more than $25 per month, the exact amount determined by his ability to pay.

Number five, Mr. Chinn shall be subject to periodic polygraph examinations at the discretion and direction of the probation officer as a means to ensure that he is in compliance with the requirements of his supervision or treatment. The polygraph testing shall be at his expense, based on the probation officer's assessment of his ability to pay.

Number six, Mr. Chinn's residence and employment shall be preapproved by the probation officer and in compliance with state and local law.

Number seven, Mr. Chinn shall submit to the installation of software and to monitor computer activities on any computer he is authorized to use at his own expense.

The software will record any and all activities on his computer. The software will be checked on a periodic basis.

Mr. Chinn has no expectations of privacy regarding computer use information stored on the computer and shall make other users of said computer aware of the monitoring software. He understands that any information gathered by said software may be used against him in subsequent court actions regarding his computer use and the conditions of supervision.

Furthermore, he shall comply with the rules set forth in the Computer and Internet Monitoring Agreement and the Computer and Internet Acceptable Use Agreement adopted by the Southern District of Ohio.

Number eight, in consideration of 18 U.S.C. Section 3583(d)(3), he shall submit and/or surrender any media device to which he has access and/or control to a search based on reasonable suspicion of contraband or evidence of a violation of a condition of supervision. A media device is defined as, but is not limited to, any device that is capable of accessing the internet, storing images, text, or other forms of electronic communication.

And number nine, Mr. Chinn shall have no unsupervised

contact with any minor children. The term "contact" extends to all forms of communication, such as mail, telephone, and other forms of electronic communication. This provision does not encompass persons under the age of 18, such as ticket vendors, cashiers, and waiters, et cetera, with whom he must deal in order to obtain ordinary and usual commercial services.

Mr. Chinn is prohibited from loitering where minors congregate, such as playgrounds, arcades, amusement parks, recreation parks, sporting events, shopping malls, and swimming pools.

I do find that Mr. Chinn does not have the ability to pay a fine, so there is no fine imposed, and I will defer any decision on the JVTA assessment or the AVA assessment.

There is a $200 special assessment, and that is due immediately.

There is also a forfeiture order that will be coming.

With that, are there any objections or legal impediments to the sentence, Mr. Thomas?

MR. THOMAS: No, Your Honor.

THE COURT: Ms. Czerniejewski?

MS. CZERNIEJEWSKI: None, Your Honor. Thank you.

THE COURT: Is there any motion regarding the remaining count of the indictment?

MS. CZERNIEJEWSKI: We would be making a motion to dismiss that.

THE COURT: Okay. That motion is granted. Count 1 then will be dismissed.

I'll go ahead and review with you your right to appeal the sentence, as you know, subject to -- we'll, of course, have the restitution issue still to address.

Mr. Chinn, under some circumstances, a defendant has the right to appeal his sentence. However, he may waive that right as part of a plea agreement.

In this case, you did enter into a plea agreement in which you waived or some of all your rights to appeal the sentence itself.

Those waivers are generally enforceable. But if you believe the waiver itself is not valid, you can present that theory to the appellate court.

If you do want to appeal, you must file a written of Notice of Appeal within 14 days from the entry of judgment.

I would count on the judgment going on today, but it will certainly go on by tomorrow at the latest. So today would start your clock.

If you cannot afford the filing fee or a lawyer to represent you, you can apply to this Court and the filing fee may be waived and a lawyer may be appointed to represent you.

Sir, do you understand your right to appeal?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you want to talk with your lawyers and let me know if you want to appeal the sentence that I just gave you?

THE DEFENDANT: No, Your Honor.

THE COURT: Okay. All right. Like I said, you got that two-week window, 14 days, if you change your mind.

Anything else we need to address today, Mr. Thomas?

MR. THOMAS: No, Your Honor.

THE COURT: Thank you.

Ms. Czerniejewski, anything for the government?

MS. CZERNIEJEWSKI: Nothing further, Your Honor. Thank you.

THE COURT: All right. Great. Thank you. Thank you, counsel.

(The proceedings were adjourned at 1:45 p.m.)

C E R T I F I C A T E

I, Allison A. Kimmel, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable Sarah D. Morrison, Chief Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.

s/Allison A. Kimmel
Allison A. Kimmel, FAPR, RDR, CRR, CRC
Official Federal Court Reporter
August 12, 2025